**Opinion issued January 29, 2026.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-25-00609-CV**

**NO. 01-25-00940-CV**

———————————

**IN THE INTEREST OF G.M.D. & V.D., CHILDREN**

**And**

**IN THE INTEREST OF Z.J.M., A CHILD**

---

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-52906, 2016-30971**

---

**MEMORANDUM OPINION**

T.R.M. ("Mother") challenges final decrees rendered in two companion cases terminating her parental rights to her minor children Z.J.M. ("Zane"), G.M.D. ("Gabriel"), and V.R.D. ("Violet") based on the court's findings that Mother

committed the predicate acts under Texas Family Code Sections 161.001(b)(1)(D), (E), (N), (O), and (P), and that termination of her rights was in the best interest of Zane, Gabriel, and Violet.[1] TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), (O), and (P).[2]

As we construe Mother's issues on appeal, Mother argues there is legally and factually insufficient evidence supporting the trial court's findings that (1) Mother committed the predicate act under Section 161.001(b)(1)(N), and (2) termination of her rights was in the best interest of Zane, Gabriel, and Violet. She also argues that the trial court abused its discretion in appointing the Texas Department of Family and Protective Services as the children's sole managing conservator.

We affirm the trial court's decrees of termination.

---

[1] To protect the identity of the minor children, we refer to them and their foster parents by pseudonyms. *See* TEX. R. APP. P. 9.8(b)(2).

[2] The Texas Legislature amended Family Code Section 161.001(b)(1) and repealed Subsection (O), effective September 1, 2025. *See* Act of May 16, 2025, 89th Leg., R.S., ch. 211, § 2, 4, 2025 Tex. Sess. Law Serv. 573, 574–75; *In re D.M.*, No. 11-25-00102-CV, 2025 WL 2980658, at *1 n.2 (Tex. App.—Eastland Oct. 23, 2025, no pet.) (mem. op.). The repeal applies only to suits affecting the parent-child relationship pending on or after the effective date. *See In re D.M.*, 2025 WL 2980658, at *1 n.2. Because the notice of appeal in this matter was filed prior to the effective date, former Subsection (O) remains in effect for the purpose of this appeal. *See id.*

Because the Texas Legislature repealed former Subsection (O), former Subsection (P) is the current Subsection (O). Any references to Section 161.001(b)(1)(O) and Section 161.001(b)(1)(P) in this memorandum opinion are to the previous version of the statute that was in effect on July 28, 2025—the date the trial court signed its order terminating Mother's parental rights to Zane, Gabriel, and Violet.

## Background

Mother has five children: A.M. ("Alan"), born in 2007, A.M. ("Amy"), born in 2009, Zane, born in 2012, Gabriel, born in 2015, and Violet, born in 2017. This appeal does not involve Alan or Amy.[3]

The Department of Family and Protective Services ("Department")[4] received multiple referrals between July 2007 and December 2023 for neglectful supervision, neglect, and physical abuse of the children by Mother. After the latest incident in December 2023, when Mother was involuntarily committed to a mental health treatment center, the Department removed Zane, Gabriel, and Violet from Mother's care and filed petitions to terminate Mother's rights to the children.[5] The trial court conducted a bench trial over four days in May and June 2025. When trial commenced, Zane was thirteen years old, Gabriel was ten years old, and Violet was eight years old.

---

[3]     Alan and Amy were not subject to the underlying cases. Both Alan and Amy live with their father's family, and Mother is not in contact with either child.

[4]     For purposes of this appeal and ease of reference, the term "Department" also includes Harris County Child Protective Services.

[5]     The underlying legal proceedings are two companion cases–one involving Zane and a second involving Gabriel and Violet. For purposes of this appeal, it is not necessary for us to discuss the procedural history of these proceedings.

## Trial

Testimony and exhibits admitted at trial reflect that Mother had a history of ongoing substance abuse and untreated mental illness, and that she neglected and endangered Zane, Gabriel, and Violet throughout their lives.

Status reports prepared by the Department, which were admitted into evidence, reflect that the Department became involved with Mother when the Department received a report for neglectful supervision and physical abuse by Mother of her oldest child Alan in July 2007. According to the report, Mother "may [have been] experiencing postpartum depression" and was "expressing suicidal and homicidal ideations."

In April 2013, the Department received another report of neglectful supervision alleging that Mother was using "marijuana daily which impair[ed] her ability to meet the supervisory needs of 1 yo [Zane]." Four months later, in August 2013, the Department received another report of neglectful supervision, physical abuse, and physical neglect by Mother alleging that two-year-old Zane was living in "an unsanitary home condition" and receiving "inadequate physical care" from Mother. Mother, who was using methamphetamines, had struck Zane with "an open hand leaving welts on [the] 2 yo's arms and legs."

Two years later in December 2015, the Department received a report for neglectful supervision of Zane and Gabriel by Mother that resulted in the children's

removal from her care. The children's caseworker, Donnisha Tate, testified that the case involved "mental health concerns, extensive drug usage, relapse, and in and out of mental health hospital."

In May 2017, the Department received a separate report for Mother's neglectful supervision of Violet, who was only a few weeks old. The Department ruled out the allegations after determining that Mother's home had "all the basic needs" to care for a newborn and Mother and Violet's father D.M.D. ("Doug") provided negative drug tests. According to the caseworker, the children were returned to Mother in August 2017 after she participated in a drug treatment program. According to Mother's medical records, she reported in June 2016 that she had been receiving drug treatment following an arrest for possession of heroin. She stated that she had used heroin "on and off" for the last two years, but she had begun "doing it daily and was either injecting it or snorting it."

In August 2018, the Department received another report for neglectful supervision of the children by Mother when she was taken to the hospital after she overdosed on prescription medication "while her children were in the home with her." Mother "admitted to hospital staff that she was attempting to kill herself because she was tired of life," and according to her medical records, Mother expressed no remorse or regret for her actions. She also reported having auditory

5

hallucinations, as well as a history of anxiety, depression, panic attacks, and self-harm.

In February 2021, the Department received another report of neglectful supervision of the children by Mother in which there "were concerns due to the mother having delusions about people searching for her, and she was hearing voices." According to the status report, Mother's behavior concerned her young children, who were unable to sleep at night.

The Department received additional reports between August 16 and December 15, 2023. The reports alleged neglectful supervision of the three children by Mother. Among other allegations, a neighbor reported to the Department that Gabriel, who was then eight years old, had been left at home several times without adult supervision. Gabriel "would be starving" and he often wandered to a neighbor's house to find food and to sleep. According to the neighbor, Gabriel was often "barefoot and filthy," and was "in the street at all times of the night." The neighbor reported that there was a foul odor coming from Mother's home and she suspected that drugs were being manufactured in the home. Gabriel told the neighbor that Mother had choked him. When the investigator called Mother, Mother refused to come home because she had an appointment at T-Mobile.

The Department received reports after Gabriel was seen twice running unsupervised across a busy street. Gabriel told the police that he cut his hand on a

fence at school and he ran away from Mother's car because Mother had threatened to take him to a mental hospital. When Gabriel's maternal grandfather came to pick him up, he told the police that Mother told him two days earlier that she was using methamphetamines again. Although the nurse told Mother when she picked up Gabriel from school that he needed stitches, Gabriel's wound cut was "open, and oozing" when he returned to school. When school officials told Mother again to take him to the hospital, Mother told them she had planned to do so, but when Gabriel ran from the car she "decided to just leave it up to his grandfather to get him care for his hand." When asked if she had seen the cut, Mother said "she ha[d]n't seen [Gabriel] and does not want to see him." Mother had expressed the same sentiment to the school principal, who told the Department that Mother "will clearly say she wants nothing to do with" Gabriel. Gabriel missed two days of school, and when he returned, the nurse learned that his grandfather had merely put superglue on his hand to treat the wound. According to the nurse, Gabriel's cut was too deep to be treated with superglue, and he needed stitches.

Gabriel told the Department that he was not staying with Mother because she is "mean to him" and yells at him and hits him when he gets in trouble. Gabriel stated that Mother usually hits him with her hand, but once she hit him with her phone. He reported that he felt safe at his grandfather's house and did not like it at Mother's

house because she "doesn't like him and he doesn't want to get hit and he doesn't want to go to the mental health center" and he is scared of her.

Zane told the Department that he too was living with his grandfather because Mother had "been locking him outside of the house." According to Zane, there is "poop everywhere" inside Mother's home and "it is really dirty." He told the Department that Mother "seems like a whole different person when she is on drugs . . . sometimes she will be nice; sometimes she isn't when she is on drugs, and she hasn't been nice very lately."

The grandfather told the Department that Mother told him she was back on methadone, which indicated to him that she was using drugs again. He did not know what drugs Mother was using but Mother said "she used to use heroin." He also stated that the inside of Mother's home was "deplorable," there was dog feces and urine "everywhere," and he could barely stand the smell. He wanted Violet to stay with him in his home, but Mother refused.

When the Department spoke to Zane again in October 2023, he reported that Mother was always asleep, would not answer the door when the children came home from school, and she did not answer calls from school. The school reported that Violet had sixteen consecutive absences and when a school liaison and police officer visited the home, Violet came to the door with tears in her eyes and was "happy to see the resource officer and the school social worker."

In the most recent incident, on December 15, 2023, Mother called the police to report an ongoing home invasion, but when the police arrived at 3 a.m. they found that Mother was hallucinating while armed with a taser and a handgun. Officer Lorna Salinas testified that Mother was "really scared and really paranoid that someone was inside" the house. According to Salinas, Mother was rambling incoherently and reportedly had locked herself in the bathroom for two hours. The inside of the home was covered in dog feces, food had been left out, the kitchen was filthy, the house was dirty, and there was trash everywhere. There was no electricity in parts of the home, and the police were unsure whether the residence had running water.

Salinas testified that the two youngest children were in one bedroom on an iPad and the older boy was staying in a "back house," with "somebody else." According to Salinas, Zane, did not appear to be surprised to see the police and the impression Salinas got was that "he was just, like, disappointed, like here we are again." According to Salinas, "it seemed like it was normal for him." The police were concerned because they did not know how long it had been since the children had attended school.

Based on her interactions with Mother and the condition of the home, Salinas concluded that Mother "was either going through some sort of mental crisis or was under the influence of drugs" and she believed that Mother was "not safe [at home]

by herself, especially with her kids." The officers took Mother into custody for an emergency detention order and left the children with neighbors.

The Department investigator who visited Mother's home after she was taken into custody reported that there was "feces as well as urine spots all over" the home, the kitchen was full of "dirty dishes, chemicals, [and] a computer monitor" and the bathtub and toilet in the hallway bathroom were unusable. All three bedrooms were filled with "clothing, appliances, frames," there was dog feces and urine in every room, including on the floor, the curtain, the bed, a pillow, and some comforters were "engrossed in feces." The investigator also saw moldy food and chemicals in Mother's bedroom.

Mother was taken to the Neuropsych Center at Ben Taub Hospital initially, but she was later transferred to Houston Behavioral Health Hospital. Medical personnel told the Department that Mother was having a "psychotic episode," and she was in the facility "on an involuntary hold due to hallucinations." Mother, who was reportedly detoxing, tested positive for opiates and morphine and she reported to hospital staff that her drug of choice was fentanyl. Although Mother was not expected to be released until December 27, 2023, the Department received a message that Mother was home on December 22, 2023, and the children were back in her care.

According to Mother's medical records, Mother reported to medical personnel at Houston Behavioral Health hospital that she had experienced feelings of hopelessness and helplessness and had suicidal ideations. She stated that her "main stressor is her heavy fentanyl use," which she had been using daily for over a year. Mother reported that the last time she used fentanyl was on December 16, 2023, the day before the police came to her home. According to her medical records, Mother has a history of anxiety, bipolar disorder, depression, and "opiod abuse on fentanyl" and she told a nurse that she was "suffering from Fentanyl withdrawals" and needed something for her nausea and vomiting. After she was taken for treatment to Memorial Hermann Hospital, Mother fled from the hospital against medical advice.

The record reflects that Mother was charged with the misdemeanor offense of theft in July 2007 and March 2008, and the felony offense of theft-third offender in January 2014. In February 2014, Mother was charged with the felony offense of possession of methamphetamines. She was charged with possession of heroin during a prior Department investigation in 2016 while her children were in the Department's care. In August 2024, Mother was arrested for the felony offense of aggravated assault with a deadly weapon (a firearm), and she was arrested again in December 2024 and charged with the felony offense of fraudulent use of identifying information.

**A.      Donnisha Tate**

Caseworker Donnisha Tate, who was assigned to work with the children in February 2024, testified that Mother has a lengthy history with the Department.

After she was assigned to this case, Tate created a Family Service Plan ("FSP") for Mother and reviewed it with Mother. The plan states that the Department was concerned there was ongoing danger to the children due to Mother's drug use, untreated mental health issues, and Mother's living conditions. It noted that Mother "severely mismanages available resources," which resulted in the children's basic needs going unmet, and that the conditions in the home were "not suitable for vulnerable children." Among other requirements, Mother's FSP required her to submit to substance abuse and psychological assessments and follow all recommendations, submit to random drug testing, attend parenting classes, and attend all court proceedings and scheduled visits with the children. She was also required to provide the Department with proof that she had safe and stable housing, employment, and income.

Tate testified that Mother never appeared for a random drug test or provided proof she had stable housing or employment. Mother also failed to visit with the children on a consistent basis and had not seen the children for a year before trial. It was Tate's opinion that Mother had abandoned them. Tate testified that Mother was arrested in November 2024 for aggravated assault with a deadly weapon, and when

she tried to visit with Mother in jail to provide her with updates about the children, Mother was very hostile and threatened Tate and her family.

Although Mother eventually completed a substance abuse evaluation and a psychological evaluation, Mother was not truthful with the evaluators, and the information Mother provided during those assessments was "wildly inconsistent." Tate testified that Mother's lack of candor with the evaluators was concerning because if Mother was not honest, then it would be difficult to get her the proper treatment. Although she initially reported that she had not used illegal drugs since she completed drug treatment in 2016, Mother reported during her second substance abuse evaluation that "she used fentanyl daily, withdrawing from methadone last August, 2024." Mother's second substance abuse evaluation recommended that Mother participate in substance abuse counseling, but Mother never completed the recommended treatment or the services recommended by her psychological evaluation. Tate testified that the only FSP requirement Mother satisfied was completing substance abuse and psychological evaluations and attending parenting classes.

With respect to the children's placement, Tate testified that the children were living together in a "fictive kin placement" that was licensed to be a foster home. The foster family planned to adopt the children. According to Tate, the foster parents provided the children with a safe place to live, medical care, found them a therapist,

13

involved the children in age-appropriate activities, and provided for the children's educational and medical needs. Tate believed that the foster parents were well-invested in making sure the children had a safe, stable, and happy place to live.

Zane and Gabriel told Tate that they wanted their foster parents to adopt them, and Gabriel was very excited about the possibility. Violet, who was very young when the removal occurred, told Tate that she liked living with her foster family, but she wanted to be with Mother, too. Tate testified that the Department believed that it was in the children's best interest for Mother's rights to be terminated so that they could be adopted by their foster family.

## B. Zakiya Bircher

Zakiya Bircher, the children's therapist, testified that she began seeing Zane, Gabriel, and Violet in July 2024, and she had been providing them with therapy twice a month for just under a year by the time of trial. According to Bircher, the children suffered from significant psychological damage caused by the prolonged, chronic, toxic trauma they had experienced while in Mother's care. Among other traumatic experiences, the children had lived in unsanitary and unstable living conditions with Mother, who suffered from untreated mental illness, used drugs while caring for the children, and was a victim of domestic violence. The children's educational needs had been neglected, and they had little or no relationship with their fathers, who were incarcerated.

Among other trauma responses, Zane exhibited "a pattern of intense, chaotic interpersonal relationships," had a fear of abandonment, had difficulty accepting responsibility for his actions, and he projected blame onto others, especially Gabriel.

Gabriel had low self-esteem, poor social skills, and he exhibited frequent disruptive, aggressive, and attention-seeking behaviors. Like Zane, Gabriel also had difficulty accepting responsibility for his actions and projected blame onto others.

Violet, who was five years old when she was removed from Mother's care and has a better relationship with Mother than her older brothers, was extremely emotionally reactive under minor stress, had difficulty trusting others, and like Zane, was very anxious about perceived abandonments in relationships. She also suffered from major depressive order resulting from her separation from Mother.

Bircher testified that although Mother mistreated all three of the children, she treated Gabriel worse than Zane and Violet. According to Bircher, Mother blamed Gabriel for his aggressive behavior, and her attitude towards Gabriel strained his relationship with his siblings, especially Zane who resented Gabriel and blamed him for the children's removal. According to Bircher, Mother had sent a message to Zane before trial in which she told Zane to give Violet her love, but she did not mention Gabriel.

Bircher testified that Gabriel's relationship with Mother was "nonexistent, very unhealthy." Zane also has a "very strained, unhealthy" relationship with

15

Mother. He feels torn between feeling protective of Mother and angry at some of her choices and "the fact that his mom put him in this situation."

Bircher testified that Zane, Gabriel, and Violet had made notable progress in therapy, and their overall well-being had improved since they were removed from Mother's care because their foster parents provided them with something Mother had not—a stable, safe, nurturing, and loving environment. According to Bircher, the consistency the foster parents provided Zane, Gabriel, and Violet was important because the children required that consistency to work on the impact of the trauma they suffered, and without that consistency, there was a greater chance the children would not heal from their traumatic experiences, and they could be exposed to additional traumas. Bircher testified that unlike Mother, the children's foster parents provided them with a safe space, where they could be open and transparent in their communications, experience a repeated pattern of positive experiences and healthy traits, and receive the therapy and medical care they required to thrive. Zane, who had a healthy attachment to his foster parents, saw them as parental figures and felt like he was "in a family unit." Bircher testified that it was in the children's best interest for Mother's parental rights to be terminated and for them to be adopted by their foster family.

## C.    Jessica Davis

Jessica Davis, a relative of Mother who had known Mother since she was a child, testified that Mother had a pattern of using drugs, receiving drug treatment and getting sober before her children were born, but Mother would also relapse and being using drugs again. Davis testified that when Zane was two-years old, Mother told her that she started using drugs again because Zane had been molested by his babysitter. According to Davis, "it was just kind of common knowledge her drug of choice was heroin at that point." Davis testified that the only time Mother was sober was when she was involved with the Department or a criminal proceeding. Davis could not recall a time when Mother had consistently done what was in her children's best interests, even when Mother was sober.

According to Davis, Mother and the children were physically abused by Gabriel and Violet's father, Doug, who used drugs and had a violent temper. She knew of approximately ten violent incidents that occurred between Mother and Doug, and she saw injuries on Mother that Mother admitted were inflicted by Doug, including "marks and bruising and swelling." Davis testified that Zane and Gabriel had red marks on their torsos and arms after Doug beat them in July 2017, and Gabriel told her that his only memory of his father was "of him punching [him] in the stomach a bunch of times until [he] cried and he wouldn't stop and it hurt." The

record reflects that Mother obtained a lifetime protective order against Doug in 2020 based on past instances of family violence.

Davis testified that Mother treated Gabriel worse than she treated Zane and Gabriel. According to Davis, Gabriel had to "scroung[e] for food" because Mother did not feed Gabriel properly, and Mother forced Gabriel to sleep "on the floor with no bedding." Davis believed that Mother's different treatment of Gabriel "absolutely" adversely affected his relationship with Zane and Violet. Gabriel told Davis that Mother physically abused him, and he described abuse that ranged from "scratch[es] to strangling to the point of losing consciousness." According to Davis, Gabriel "described in detail a very traumatic situation that was recurring where [Mother] would pick him up at the front-end of the hall by the neck and carry him down the hall, which is about 20 feet . . . and he would wake up by himself later on the ground." Gabriel lived with Davis during the summer of 2023 because Mother had kicked the eight-year-old out of the house, and he was living with Mother's stepfather in another house on the property when the children were taken into the Department's care in December 2023.

When asked why she believed it was in the children's best interests for Mother's parental rights to be terminated, Davis stated:

> Because these children deserve a chance at life. They deserve love. They deserve healing from their trauma so the cycle of abuse can end, and the [foster parents] have exhibited their dedication to the children and to that process. And I believe it's in their best interests to have

18

stability. I believe that the best hope of them being productive, healthy, happy adults is for them to have termination with the parents and to be with the [foster parents].

**D.      Foster Parents**

Zane, Gabriel, and Violet were placed with the same foster family over a year before trial began. The children's foster mother, who had known Mother for over twenty years and had a very distant relationship with her, testified that Zane and Gabriel had lived with her for a few months in 2017 when they were taken into the Department's care after the Department received a referral alleging Mother had neglected the children. Violet was born while that case was pending. According to the foster mother, Mother had been charged with drug possession and theft. She testified that she knew Mother had struggled with substance abuse and the foster mother had always made herself available as a refuge for the children.

The foster mother testified that she and her husband ensured that the children attempted therapy and received regular medical care, including annual checkups. Although the children had a "very bad" relationship with each other when they moved in with their foster family, the children's relationship had improved. The children were happy and doing well in school, and they were very active in church. She testified that Mother never sent gifts or support for the children, and the children had not seen Mother for a year before trial. According to the foster mother, the children had stopped asking about Mother and they no longer expected to hear from

her. She testified that Zane experienced "immediate emotional and mental damage" when Mother contacted him before trial began and the foster mother did not tell Gabriel and Violet about it because she did not want to upset them as well.

Approximately a month after Gabriel was placed in her home, Mother contacted the foster mother and accused Gabriel of "awful things," and told the foster Mother not to keep Gabriel because "he was a danger." The foster mother denied Mother's accusations against Gabriel, "a regular 10-year-old boy who's been through some really terrible stuff." According to the foster mother, Gabriel was "so loving and so caring, and he's got a lot of positivity compared to where he came from."

The foster mother and foster father testified that they were bonded with the children and wanted to adopt them. They had spoken to the children about their plans and Gabriel was "very excited" about the possibility that he could be adopted. Zane was open about adoption and Violet, who had been more hesitant, was also open to the possibility of adoption. The foster mother testified that terminating Mother's parental rights was in the children's best interests because it would provide the children with the stability and sense of safety that they needed, and the children would "feel safe, like they are home."

## Decrees of Termination

On July 28, 2025, the trial court signed final decrees of termination finding that Mother had committed the predicate grounds for termination under Section 161.001(b)(1)(D), (E), (N), (O), and (P), and that termination of Mother's parental rights to Zane, Gabriel, and Violet was in the children's best interest. The court terminated Mother's parental rights to Zane, Gabriel, and Violet and appointed the Department as the children's sole managing conservator.[6] This appeal followed.

## Family Code Section 161.001(b)(1)(N)

Mother identifies her first issue as challenging the legal and factual sufficiency of the evidence supporting the trial court's finding that she committed the predicate act for termination under Section 161.001(b)(1)(N) of the Family Code. But Mother's brief does not address the elements of Subsection (N).[7] Instead, Mother argues there is evidence that she has a significant bond with Zane, Gabriel, and

---

[6]  The trial court also terminated the parental rights of Gabriel's and Violet's father D.M.D. and the parental rights of Zane's father J.A.N. and an unknown father. D.M.D., J.A.N., and the unknown father are not appealing the termination of their parental rights.

[7]  Under Section 161.001(b)(1)(N), a parent's rights may be terminated if clear and convincing evidence establishes the parent "constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months," the Department made "reasonable efforts to return the child to the parent," the parent had not "regularly visited or maintained significant contact with the child," and "the parent has demonstrated an inability to provide the child with a safe environment." TEX. FAM. CODE § 161.001(b)(1)(N).

21

Violet, that Violet wants Mother to remain in her life, and that the May 2025 email Mother sent to Zane is evidence of Mother's efforts to "contact, connect, and communicate" with Zane and Violet.

These arguments are more pertinent to a challenge to the sufficiency of the evidence supporting a trial court's finding that termination of a parent's rights was in the child's best interest. We thus address the trial court's best interest findings further below. With respect to Mother's challenge to Subsection 161.001(b)(1)(N), we overrule her issue. "To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019); *see also In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (stating one predicate finding under Section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest"). The trial court terminated Mother's parental rights to Zane, Gabriel, and Violet based on the court's findings that Mother committed the predicate acts under Sections 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (N) (constructive abandonment), (O) (failure to complete court-ordered service plan), and (P) (endangerment caused by parent's drug use). By failing to challenge the trial court's termination findings under Section 161.001(b)(1) (D), (E), (O), and (P), Mother

22

waived any complaint about the sufficiency of the evidence supporting these findings and thus we need not consider whether sufficient evidence supports the trial court's finding under Subsection 161.001(b)(1)(N). *See In re S.C.M.*, No. 01-22-00964-CV, 2023 WL 3873342, at *5 (Tex. App.—Houston [1st Dist.] June 8, 2023, pet. denied) (mem. op.) (holding parent waived challenge to predicate findings not challenged on appeal).

Ordinarily, it would be necessary for us to review the trial court's findings under Subsections (D) and (E) because termination of parental rights on either basis can serve as the basis for termination of the parent's rights to another child in the future. *See In re N.G.*, 577 S.W.3d at 235 (stating due process requires review of trial court's findings under Subsection (E) "even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child"); TEX. FAM. CODE § 161.001(b)(1)(M) (authorizing trial court to terminate parent's parental rights to child if court finds by clear and convincing evidence parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)"). This requirement, however, only applies when the parent challenges the sufficiency of the evidence supporting the trial court's endangerment findings under (D) and (E). *See In re N.G.*, 577 S.W.3d 230 at 237 ("Allowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal *when the*

23

*parent has presented the issue to the court* thus violates the parent's due process and due course of law rights.") (emphasis added); *see also In re A.B.-G.*, No. 01-24-00509-CV, 2024 WL 4982500, at *11–12 (Tex. App.—Houston [1st Dist.] Dec. 5, 2024, pet. denied) (mem. op.) (holding *In re N.G.*'s requirement that appellate courts review predicate findings under Subsections (D) and (E) if challenged, even where another ground is sufficient for termination, does not apply when findings under (D) and (E) are not challenged); *In re M.M.H.*, No. 10-19-00456-CV, 2020 WL 830804, at *2 n.2 (Tex. App.—Waco Feb. 19, 2020, no pet.) (mem. op.) (stating *In re N.G.* does not require appellate court to review sufficiency of evidence supporting endangerment findings under Subsections (D) and (E) when parent's sole issue on appeal was challenge to trial court's best interest finding). Because Mother is not challenging the sufficiency of the evidence supporting the trial court's findings that she committed the predicate acts under (D) and (E), we need not review those findings.

We overrule Mother's first issue.

**Best Interest**

Mother argues that the evidence reflects she has a significant bond with Zane, Gabriel, and Violet, Violet wants Mother to remain in her life, and the May 2025 email Mother sent to Zane is evidence of Mother's efforts to "contact, connect, and communicate" with Zane and Violet. Although Mother did not challenge the trial

court's best interest findings in her stated issues, these arguments are pertinent to a challenge to the sufficiency of the evidence supporting a trial court's best interest finding. *See generally Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (identifying list of non-exclusive best interest factors, including child's desires). We thus liberally construe Mother's argument as a challenge to the legal and factual sufficiency of the evidence supporting the trial court's findings that termination of her parental rights to Zane, Gabriel, and Violet is in the children's best interest.

## A. Applicable Law

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *See In re A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). But there is also a presumption that the "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for permanence through establishment of stable, permanent home is paramount consideration in best interest determination).

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley*, 544 S.W.2d at 371–72. These factors are not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

We may also consider the statutory factors under Texas Family Code Section 263.307, including (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate

with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest). Sections 161.001(b)(1)(D) and (E) authorize the termination of a parent's rights to a child when the parent has endangered the child's

physical or emotional well-being.[8] The term "endanger" encompasses a broad "array of conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating parent's conduct which subjects child to life of uncertainty and instability endangers child's physical and emotional well-being). "[E]ndangering conduct is not limited to actions directed towards the child." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). The danger to the child may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffered no actual injury. *See Boyd*, 727 S.W.2d at 533 (stating although endanger means "more than a threat of metaphysical injury or the possible ill effects," "it is not necessary that the conduct be directed at the child or that the child actually suffers injury"); *see also In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied) (stating parent's conduct before child is born and treatment of other children can support finding of endangerment).

---

8      Under Section 161.001(b)(1)(D), a parent's rights may be terminated if clear and convincing evidence establishes the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(D). Under Section 161.001(b)(1)(E), a parent's rights may be terminated if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

**B.    Analysis**

Multiple factors support the trial court's findings that termination of Mother's parental rights is in the best interest of Zane, Gabriel, and Violet, including Mother's lengthy history of endangering her children, who experienced profound neglect and physical abuse while in Mother's care, her ongoing use of fentynal and other drugs in a manner or under circumstances that harmed or threatened to harm the children, and her untreated mental illness.

As to the present and future emotional and physical dangers to Zane, Gabriel, and Violet, the evidence shows that Mother endangered the children's well-being by allowing them to live in unsafe and unsanitary conditions. *See Holley*, 544 S.W.2d at 372 (identifying present and future emotional and physical dangers to child as best interest factor). Multiple witnesses reported that Mother's home was unsanitary. There was dog feces and urine on the floors, bedroom curtains, and linens. The bathtub and toilet in the hallway bathroom were unusable and only part of the home had electricity. Rotting food was left out and the kitchen sink was full of "dirty dishes, chemicals, [and] a computer monitor." *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *16 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (holding evidence parent allowed child to live in unsanitary conditions supports endangerment and best interest findings). She also left Gabriel home alone on multiple occasions. *See In re J.D.*, No. 02-24-00404-CV, 2025 WL

29

52128, at *15 (Tex. App.—Fort Worth Jan. 9, 2025, no pet.) (mem. op.) (stating evidence mother left child without adult supervision supports best interest finding).

The evidence of Mother's twelve years of ongoing illegal drug use, including throughout the pendency of the case, supports the trial court's best interest finding. The record reflects that Mother had a pattern of using different illegal drugs, receiving drug treatment and getting sober, but then relapsing, and she endangered her children by using illegal drugs in a manner or under circumstances that harmed or threatened to harm the children. Mother was using "marijuana daily" in April 2013, and her drug use "impair[ed] her ability to meet the supervisory needs" of Zane, who was then oneyear old, and she was using methamphetamine in August 2013, while caring for Zane, who was living in unsanitary conditions and receiving "inadequate physical care" from Mother. Although Mother apparently achieved sobriety afterwards, she told Davis when Zane was two years old that she relapsed after learning that he had been molested by a babysitter. According to Davis, it was "common knowledge her drug of choice was heroin at that point."

While Mother had a case pending with the Department in June 2016, Mother admitted that she had used heroin "on and off" for the last two years, and she had started "doing it daily and was either injecting it or snorting it."

In December 2023, Mother tested positive for opiates and morphine, and she reported to hospital staff that her drug of choice was fentanyl, which she had been

30

using daily for over a year. Mother reported that the last time she had used fentanyl was on December 16, 2023, the day before the police came to her home. Eleven-year-old Zane told the Department that he knew what drugs look like and he can tell when Mother is using drugs because she "seems like a whole different person."

Mother never appeared for random drug testing during the seventeen months the case was pending and days before trial began in May 2025, Mother reported to her substance abuse evaluator that "she used fentanyl daily, withdrawing from methadone last August, 2024."

This evidence of Mother's ongoing illegal drug use shows that Mother endangered her children's physical and emotional well-being and thus supports the trial court's best interest finding. *See In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) ("A continuing pattern of illegal drug use. . . implicates most of the *Holley* factors and will support a finding that termination of parental rights is in a child's best interest."); *In re R.R.A.*, 687 S.W.3d at 281 (recognizing parent's "positive drug tests in 2020 and across-the-board refusal to undergo service-plan tests from November 2020 to September 2021 sufficiently develop[ed] [his] continued pattern of drug use"). A fact finder may infer that such endangering conduct may recur in the future if the children were returned to Mother's care. *See In re D.M.*, 452 S.W.3d at 471 (stating factfinder may infer that past endangering conduct will recur if child returned to parent).

There is also evidence that Mother physically abused and neglected Gabriel and Zane and she exposed all three children to domestic violence while they were in her care. Gabriel, who was eight years old at the time, reported that Mother routinely hit him when he was in trouble and she had strangled him "to the point of losing consciousness" on several occasions. The Department's records show that Mother had also struck Zane with an open hand when he was two years old, leaving welts on his arms and legs.

In addition to the violence perpetrated against the boys by Mother, there is also evidence that Gabriel and Violet's father, Doug, would beat Mother and the boys. According to Davis, Doug had assaulted Mother on at least ten occasions, and she had seen Mother's injuries, including "marks and bruising and swelling." Davis testified that Zane, who was then five years old, and Gabriel, who was then two years old, had red marks on their torsos and arms after Doug beat them in July 2017. Gabriel told Davis that his only memory of his father was "of him punching [him] in the stomach a bunch of times until [he] cried and he wouldn't stop and it hurt." This evidence also supports the trial court's best interest finding. *See In re L.W.,* 2019 WL 1523124, at *11, 13, 19 (stating evidence mother physically abused children and children witnessed violence in home supports endangerment and best interest findings).

Mother failed to obtain adequate medical care for Gabriel after he injured his hand, and although she knew that Zane was molested by a babysitter when he was two years old, Mother did not report the abuse or seek medical care for Zane. *See In re A.B.*, 125 S.W.3d 769, 778 (Tex. App.—Texarkana 2003, pet. denied) (stating parent's "failure to protect the emotional well-being of the children following the allegations of sexual abuse" supports trial court's best interest finding); *see generally In re S.G.S*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.) (reasoning that factfinder could infer from actual neglect of one child that physical and emotional well-being of other children was also jeopardized).

There is also evidence that Mother treated Gabriel worse than she treated Zane and Violet. According to Davis, Gabriel had to "scroung[e] for food" because Mother did not feed him properly, she forced Gabriel to sleep "on the floor with no bedding" while Mother shared her bed with Zane and Violet, and she left Gabriel home alone while she took his siblings with her. Mother also repeatedly told school officials that she did not want anything to do with Gabriel, made disturbing accusations against him which his foster mother refuted, threatened to have the eight-year-old committed to a mental hospital, and she told her stepfather that she was planning to move to Corpus Christi, but she was taking only Zane and Violet with her. Multiple witnesses also testified that Mother's treatment of Gabriel

adversely affected his relationship with Zane and Violet and caused his siblings to resent him and blame him for their removal from Mother's care.

There is also evidence of Mother's ongoing mental health issues, including multiple psychotic episodes, a suicide attempt that occurred while Mother was alone with the children, and Mother's failure to address those issues through treatment offered by the Department during this and prior cases. *See In re B.A.M.*, No. 01-22-00048-CV, 2022 WL 2513477, at *9 (Tex. App.—Houston [1st Dist.] July 7, 2022, no pet.) (mem. op.) (stating that while mental illness alone is insufficient to show endangerment, a parent's failure to access available treatment endangered child).

The evidence also reflects that Mother was charged with the misdemeanor offense of theft in July 2007 and March 2008, the felony offense of theft-third offender in January 2014, and the felony offense of possession of methamphetamines in February 2014. She was charged with possession of heroin during a prior Department investigation in 2016 while her children were in the Department's care and she was arrested twice during the pendency of the current case and charged with the felony offenses of aggravated assault with a deadly weapon and fraudulent use of identifying information. This evidence also supports the trial court's best interest finding because Mother's criminal activity caused her to be away from her children and subjected them to a life of uncertainty and instability. *See In re V.V.*, 349 S.W.3d 548, 554, 558 (Tex. App.—Houston [1st

34

Dist.] 2010, pet. denied) (stating criminal activity that exposes parent to incarceration is conduct that endangers child's physical and emotional well-being and supports best interest finding).

Evidence that Mother attended only eight of twenty-seven scheduled visits with the children and she had not seen the children for over a year before trial also supports the trial court's best interest finding. *See In re J.G.*, No. 02-21-00257-CV, 2022 WL 187983, at *9 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op.) ("[A] trial court may consider in its analysis a parent's failure to visit, which can endanger the child's emotional well-being.").

With respect to the present and future physical and emotional needs of the children, the record reflects that Mother failed to meet many of her children's basic needs, including failing to provide them with a safe and sanitary home. *See Holley*, 544 S.W.2d at 372 (identifying present and future physical and emotional needs of child as best interest factor); TEX. FAM. CODE § 263.307(b)(12)(A) (stating parent's ability to provide child with "minimally adequate health and nutritional care" is best interest factor). Mother also failed to maintain stable housing and employment throughout the pendency of the case. *See In re A.J.–A.*, No. 14–16–00070–CV, 2016 WL 1660858, at *5 (Tex. App.—Houston [14th Dist.] Apr. 26, 2016, no pet.) (mem. op.) ("Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs."); *Holley*, 544

S.W.2d at 372 (recognizing stability of home and ability to provide for child's current and future physical and emotional needs as best interest factors). There is also evidence that Gabriel was often seen barefoot and dirty, and that he routinely would go to a neighbor's house to look for food and a place to sleep. *See In re K-A.B.M.*, 551 S.W.3d 275, 288 (Tex. App.—El Paso 2018, no pet.) ("A child's basic needs include food, shelter, clothing, routine medical care, and a safe, stimulating, and nurturing home environment.").

Mother's failure to obtain adequate medical care for Gabriel after he injured his hand and her neglect of the children's educational needs, as reflected by evidence that Violet had sixteen consecutive absences from school, are indicative of Mother's poor parenting abilities and her inability to meet the children's needs and thus supports the best interest finding. *See In re L.W.*, 2019 WL 1523124, at *22 (holding parent's failure to seek prompt medical attention for children when needed was indicative of parent's poor parenting abilities and supported best interest finding); *In re A.O.M.*, No. 14-15-01012-CV, 2016 WL 1660630, at *6 (Tex. App.—Houston [14th Dist.] Apr. 26, 2016, pet. denied) (mem. op.) (stating evidence of parents' failure to ensure children were enrolled in school indicative of inability to meet child's needs and inadequate parental abilities).

Mother's use of heroin during the pendency of a prior case in 2016 and her use of fentanyl during the current case also indicate that she lacks the parental

abilities necessary to care for the children and supports the trial court's best interest finding. *See In re D.R.*, 631 S.W.3d 826, 835 (Tex. App.—Texarkana 2021, no pet.) ("Mother's use of methamphetamine during the pendency of the case, even after being released from inpatient treatment, showed that she lacked the parental abilities necessary to care for the children, that she failed to learn from the programs available to assist her, and that the existing parent-child relationship was not a proper one.").

Although Mother was required to do so by her FSP, it is undisputed that Mother never appeared for a random drug test or provided the Department with proof she had safe, stable housing, employment, or income. Mother also failed to maintain contact with the Department, and she had not visited the children for over a year before trial. This evidence of Mother's failure to complete her FSP also supports the trial court's finding that termination of Mother's rights to the children is in the children's best interest. *See In re C.H.*, 89 S.W.3d at 28 (stating evidence mother failed to complete her family service plan supports best interest finding).

The children's therapist testified that the children had significant needs for safety, structure and stability in order to process the trauma they suffered while in Mother's care. By all accounts, the children's foster parents have provided them with the loving, safe, stable, and nurturing environment they require, and the children are thriving in their care. The record reflects that the foster parents have provided for the children's therapeutic and medical needs and are actively involved in the

37

children's education. There is also evidence that Zane, Gabriel, and Violet are well bonded to their foster parents, who want to adopt the children, Gabriel is excited about the possibility that his foster parents will adopt him, and Zane and Violet are open to the idea. *See Holley*, 544 S.W.2d at 372 (recognizing child's present and future physical and emotional needs, present and future emotional and physical dangers to child, parental abilities of persons seeking custody, plans for child by individuals seeking custody, child's desires, and stability of home or proposed placement as best interest factors); *see also In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires.").

Viewing the evidence in the light most favorable to the trial court's finding, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of Zane, Gabriel, and Violet. *See In re J.F.C.*, 96 S.W.3d at 266.

Mother argues that her rights should not be terminated because there is evidence that she is bonded with the children, especially Violet, and she contacted Zane on the eve of trial in an effort to connect and communicate with Zane and

Violet. In view of the entire record, however, this evidence is not so significant it could have prevented the trial court from forming a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *Id.*

We overrule Mother's first issue.

## Conservatorship

In her third issue, Mother argues the trial court abused its discretion by appointing the Department as the children's sole managing conservator.

Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 856. Once we overrule a parent's challenge to an order terminating her parental rights, the trial court's appointment of the Department or another person as the child's sole managing conservator may be considered a "consequence of the termination." *In re J.D.G.*, 570 S.W.3d at 856.[9]

---

[9] When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a).

Because we have overruled Mother's challenge to the trial court's decrees terminating her parental rights to Zane, Gabriel, and Violet, the decrees divested Mother of her legal rights and duties to these children. *See* TEX. FAM. CODE § 161.206(b) (stating order terminating the parent-child relationship divests parent of legal rights and duties with respect to child); *In re J.D.G.*, 570 S.W.3d at 856. Consequently, Mother does not have standing to challenge the portions of the decrees appointing the Department as the sole managing conservator of Zane, Gabriel, and Violet. *In re J.D.G.*, 570 S.W.3d at 856 (affirming termination of mother's parental rights and holding that mother, who had been divested of her legal rights to child, did not have standing to challenge conservatorship determination).

We overrule Mother's third issue.

## Conclusion

We affirm the trial court's decrees of termination.


Veronica Rivas-Molloy
Justice


Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.